IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN JONES, a Pennsylvania Resident,      )
                                          )
              Plaintiff,                   )
                                          )
       vs.                                 )        **2:02cv1166**
                                          )        **Electronic Filing**
CITY OF PITTSBURGH,                        )
ERIC DAVIS, Individually and in his        )
official capacity as police officer for the )
City of Pittsburgh, and JOHN DOE A         )
THROUGH Z, whose names are currently       )
unknown, individually and in their official )
capacities as police officers for the      )
City of Pittsburgh,                        )
                                          )
              Defendants.                  )

## O P I N I O N

CERCONE, D.J.

       Plaintiff commenced this civil rights action seeking redress for injuries resulting from a

gun shot wound sustained during a police-witnessed altercation between plaintiff and his

neighbor.  Plaintiff's amended complaint set forth four causes of action: Count I - deprivation of

constitutional rights in violation of 42 U.S.C. § 1983; Count II - deprivation of Pennsylvania

constitutional rights; Count III - negligence; and Count IV - punitive damages. Defendant filed a

motion to dismiss, which the court granted in part on September 5, 2003. Pursuant to an opinion

and order, counts II through IV were dismissed and plaintiff's submissions were construed as

raising two theories of liability under § 1983 at Count I: (1) "plaintiff ... was intentionally denied

the protective services which [police] Officer Davis could have provided because [plaintiff] was

a young African-American male"; and (2) a state created danger theory pursuant to Kneipp v.

Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). Discovery has been completed. Presently before the

court is defendants' joint motion for summary judgment.  For the reasons set forth below, the

motion will be granted.

       Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted

if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477

2

U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362

(3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh

facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the

evidence).

Plaintiff's complaint is based upon the historical events summarized below.[1]  On the

morning of May 21, 2002, plaintiff encountered Ms. Williams in the front hallway of plaintiff's

home.  Ms. Williams and Ricky Williams often stayed in the house across the street from

plaintiff's residence.  Plaintiff had reason to believe Ms. Williams had just broken into and

ransacked his residence, and a verbal exchange occurred between plaintiff and Ms. Williams.

That afternoon Ricky Williams came to plaintiff's house and instigated an argument over

plaintiff's earlier encounter with Ms. Williams.  Plaintiff attempted to challenge Ricky Williams

to fight, but was confronted by several of his colleagues who were coming to his aid with drawn

hand guns, including Mrs. Williams.  Affidavit at §§ 10-15.

At midnight, plaintiff left his house and upon returning at 4:30 a.m., discovered that his

home had been burglarized.  Plaintiff called the Pittsburgh Police and Officer Klein was

dispatched to the scene.  Plaintiff advised Officer Klein that he believed Ricky Williams was the

perpetrator of the burglary.   Williams was sitting on the front porch across the street and plaintiff

pointed Williams out to Officer Klein.  Plaintiff told Officer Klein about Williams and his

associates drawing guns on him earlier that day.  Officer Klein completed a report but did not

confront Williams or question him at that time.  She advised that a detective would come and

further process the crime scene.  Plaintiff's front door was broken.

---

[1]Plaintiff suffers from cognitive impairment and is described by his counsel as having the
intellectual ability of an eight year old.  A comparison of plaintiff's averments in the complaint,
testimony in a related state court prosecution, deposition in the instant case and affidavit in
support of summary judgment reveals discrepancies in plaintiff's version of what happened at the
scene, particularly with regard to the actions of Officer Davis and the duration of time between
the commencement of the altercation and plaintiff being shot.  For this reason, the historical
events summarized below are based on the view most favorable to plaintiff after considering the
statements of plaintiff that the finder of fact could credit as believable.

A detective did not return to plaintiff's house that day. Plaintiff called the Zone 4 police station several times, advising that he was in fear for his life. A police officer appeared at plaintiff's house, identified himself as Officer Klein's supervisor, and threatened to arrest plaintiff if he continued to call the station. Williams was sitting on his front porch watching what transpired.

After the officer left, plaintiff called 911 for help. Officer Klein then returned to plaintiff's house and advised him that the detectives were coming to take fingerprints and plaintiff should remain outside his house. Plaintiff remained outside for several hours. Williams continued to peer across the street and watch plaintiff. Plaintiff called 911 again and complained that his safety was in jeopardy because Williams and his friends had guns, Williams was on his porch watching plaintiff, and plaintiff's front door was broken, making it impossible for him to be safe in his own home. The 911 operator indicated she would send the detectives.

On May 23, 2002, the detectives came and took fingerprints. Plaintiff advised that he believed Williams was the perpetrator and that Williams and seven others had drawn guns on him the day before. The detectives did not respond to this information. Plaintiff left his house and stayed at his mother's place that night.

On the morning of May 24, 2002, plaintiff was parking his truck in front of his residence. Ricky Williams ran out of a neighbor's house, proceeded toward plaintiff, ripped off his shirt, pounded on the windshield of plaintiff's truck and challenged plaintiff to a fight. When plaintiff exited his vehicle, Williams lunged at him. Plaintiff punched Williams in self-defense, and thereafter a heated argument ensued. Officer Davis was by himself on routine patrol, came upon the scene in a marked patrol car and began to witness the ongoing argument between Williams and plaintiff. Williams appeared to be attempting to extract something from his pants pocket. Officer Davis observed the argument and Williams searching through his pockets, but remained in his patrol car. Upon inquiry from plaintiff Williams advised that he had a gun, and plaintiff yelled to Officer Davis in an attempt to convey that Williams was going to draw a gun. Officer

4

Davis remained in the patrol car.

As the fight between Williams and Jones progressed, the two were moving down the street. Officer Davis called for back-up and followed the two in his patrol car as they progressed down the street. Williams ran to the base of a hill located in a neighbor's yard. Plaintiff ran after Williams and grabbed him by the ankle, but Williams got away. Williams proceeded to the top of the hill, drew a handgun, and fired two shots at plaintiff, striking him in the leg above the knee. Officer Davis remained in the squad car, reported to dispatch that shots had been fired  and watched as Williams as he ran off.

Following the incident plaintiff attempted to advise Officer Davis that he had been shot, but Officer Davis remained in the patrol car and did not respond. Plaintiff hobbled to his truck, pulled his vehicle up next to the patrol car and informed Officer Davis that he was shot and was driving himself to the hospital. Officer Davis then called for medical assistance, which was provided to plaintiff after his vehicle was stopped en route by three patrol cars.

Officer Davis maneuvered his patrol car in order to keep Williams in his sight. Other officers arrived at the scene. Officer Davis exited his vehicle and attempted to apprehend Williams. Williams eluded Office Davis.

Plaintiff and Williams are African-American males. Complaint at ¶ 17. "Plaintiff avers that the Pittsburgh Police Bureau did not take action in the above incidents because it did not want to involve itself in a feud between two African-Americans." Id. at ¶ 18. Williams was convicted of assault and sentenced to incarceration. Williams has continued to threaten plaintiff and the members of his family. Id. at ¶ 19. Plaintiff has suffered permanent injury to his leg and has reason to believe Williams will attempt to kill him. Id. at ¶ 20. The burglary case remains open.

Plaintiff concedes that Davis called dispatch at 10:19:37 a.m. and indicated that he was on the scene. Plaintiff's Counter Statement of Material Facts (Doc. No. 54) at ¶ 66. Officer Davis called for back-up at 10:22:50. Id. Plaintiff concedes that the timing as derived from the

5

emergency operations center printout is not in "real time" and may not be accurate. Id. at ¶ 70.

Plaintiff has submitted the "running sheets" of six other officers and one supervisor who responded to Office Davis' report of shots being fired. Exhibit W to Plaintiff's Counter Statement of Material Facts (Doc. No. 55). The responding officers' daily activity reports contain individual accounts of Officer Davis' request for back-up. Officer Baumgart recorded receiving a report of a man being shot at 10:18 a.m., and arrived on the scene at 10:21 a.m.; Officer Germany recorded a call reporting a man shot at 10:21 a.m., and he arrived on the scene at 10:30 a.m.; Officer Skinger logged a call for back-up at 10:18 a.m., and he arrived on the scene at 10:23 a.m. and engaged in foot pursuit of the shooting actor; Officer Curges logged a call reporting a fight/shooting at 10:18 a.m., and arrived on the scene at 10:20 a.m.; Officer Beige logged a shooting call at 10:00 a.m., reported arriving at the scene at 10:15 a.m.; and recorded the completion of his activities at the scene at 10:30 a.m.; Sergeant Washington logged a shooting call at 10:19 a.m., arrived at the scene at 10:24 a.m., and completed his activities at the scene at 11:50 a.m.; and Supervisor Lamb logged a call of shots being fired at 10:20 a.m., and recorded activities being completed approximately one hour and fifteen minutes later. Id. Thus, three responding officers reported receiving the call for back-up at 10:18 and arriving on the scene a few minutes later. Id.

A brief summary of the legal landscape governing the court's rulings on defendants' motions to dismiss is necessary to place plaintiff's pending theories of liability in proper context. Each of the pending theories is based on § 1983 liability.[2]

With regard to plaintiff's § 1983 claim at Count I, the City of Pittsburgh ("the City")

---

[2] In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right. Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under 42 U.S.C. § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997).

moved to dismiss plaintiff's amended complaint on a variety of grounds.  It contended that

plaintiff's complaint failed to identify the violation of any constitutional or federal right, and

more specifically, that plaintiff had not identified a municipal policy or custom that caused a

violation of a constitutional right.[3]   In support it noted that absent a special relationship between

the state and a citizen that places the individual within the state's custody and control, a citizen

has no constitutional right to adequate police protection from the violent acts of another citizen.

See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 202 (1989).[4]  It further

---

[3]Whether a municipal government may be held liable under § 1983 is governed by the doctrine
announced in Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).
There, the Supreme Court held that liability against such an entity may not be established by the
respondeat superior doctrine, but instead must be founded upon evidence indicating the
government itself supported a violation of the plaintiff's constitutional rights.  See Bielevicz, 915
at 849-50.  "Thus, municipal liability attaches only when 'execution of a government's policy or
custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to
represent official policy, inflicts the injury.'" Id. (quoting Monell, 436 U.S. at 694).

[4]In DeShaney, the Court considered whether a county social services department had a
constitutional duty to protect a child from physical abuse.  For more than a year the Department
of Social Services of Winnebago County in New York had received medical information strongly
suggesting a child was being abused by his father.  Nevertheless, the department failed to remove
the child from the home.  Eventually the father's beatings lead to brain damage and profound
retardation.  The child's mother contended the department should have been or actually was
aware of the ongoing danger to the child and had a constitutional obligation to intervene on his
behalf.  The Court rejected this proposition, reasoning as follows:

> [w]hile the State may have been aware of the dangers that Joshua faced in the free
> world, it played no part in their creation, nor did it do anything to render him any
> more vulnerable to them.  That the State once took temporary custody of Joshua
> does not alter the analysis, for when it returned him to his father's custody, it
> placed him in no worse position than that in which he would have been had it not
> acted at all; the state does not become the permanent guarantor of the individual's
> safety by having once offered him shelter.  Under these circumstances, the State
> had no constitutional duty to protect Joshua.

DeShaney, 489 U.S. at 201.  In other words,  in the absence of state-created circumstances that
render an individual less able to care for him or herself "a State's failure to protect an individual
against private violence does not constitute a violation of the Due Process Clause."  Id. at 197.
The United States Court of Appeals for the Third Circuit has reiterated this principle on a number

asserted that the complaint failed to raise the existence of a special relationship because plaintiff did not allege he was in custody or restrained by a police officer.  The City also contended that the complaint failed to identify any affirmative action by Officer Davis that rendered plaintiff more vulnerable to the danger created by plaintiff's initial encounter with Ricky Williams, which constitutes the only other exception to the rule established in DeShaney.  See generally, Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996) (liability under § 1983 will be recognized where a state actor (1) affirmatively creates a danger which harms an individual under the actor's custody or control or (2) takes action which renders such an individual more vulnerable to an existing danger).[5]

Defendant Eric Davis moved to dismiss on similar grounds.  Like the City, he also contended that Count I failed to identify a deprivation of a constitutional or federal right because the Constitution does not place a duty on a police officer to protect an individual from the criminal acts of another.

In response, plaintiff acknowledged his obligation to meet the requirements of Monell in imposing liability against the City.  He also acknowledged his burden to prove that Officer Davis violated his constitutional rights.  He contended, however, that he would be able to meet these

---

of occasions.  See Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) ("a state's failure to protect an individual against private violence does not constitute a violation of due process"); Brown v. Commonwealth of Pennsylvania Department of Health Emergency Medical Services Training Institute, 318 F.3d 473, 476 (3d Cir. 2003)( "there is no federal constitutional right to rescue services, competent or otherwise.").

[5]In DeShaney, the Court emphasized that a "special relationship" may impose a duty of protective care on the state, such as where an individual has been taken into custody or otherwise restrained or limited in freedom of choice by state conduct.  While the Court limited the "special relationship" to these narrow circumstances, it was careful not to foreclose liability under what subsequently has become known as "the state-created danger theory."  Kneipp, 95 F.3d at 1205. The United States Court of Appeals for the Third Circuit has expressly held "that the state-created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983."  Id. at 1211.

burdens because members of the Pittsburgh Police, including Officer Davis, had engaged in a practice of retaliating against the mandate of a consent decree entered between the United States Department of Justice and the City of Pittsburgh in <u>United States of America v. City of Pittsburgh, et al.</u>, CA 97-354, W.D. Pa. (1997), by refusing to become involved in public altercations between African-American males.  Plaintiff thus asserted that Officer Davis violated plaintiff's right to equal protection of the law codified at 42 U.S.C. § 1981, and the City was responsible for the officer's conduct due to a long-standing policy or custom of failing to train its police officers in cultural diversity.  In other words, plaintiff contended that he had been the victim of an intentional decision by Officer Davis not to provide police protection and to exercise "no force" in accordance with an implicit policy and practice within the Pittsburgh Police department.  This policy and practice was asserted to have developed in response to and in retaliation for the City's settlement of claims arising from the United States Department of Justice's investigation into the use of excessive force against the citizens of Pittsburgh in general and the African-American community in particular. The City also assertedly was partly responsible for the alleged deprivation of plaintiff's rights due to its failure to train its officers: first in the proper use of force; and also in the cultural diversity training required by the consent decree.

In light of the liberal standards governing a motion to dismiss and after giving plaintiff the benefit of doubt about his ability to generate evidence to support his allegations, the court permitted plaintiff to pursue two separate theories of § 1983 liability against Officer Davis that might be able to survive defendants' <u>DeShaney</u> challenge: (1) that Officer Davis intentionally refused to provide police protection to plaintiff because he was an African-American; and (2) a state action enhanced danger claim based on Williams becoming emboldened and perpetrating additional foreseeable violent conduct that would not have otherwise occurred but for Officer Davis' purported lack of involvement. The court observed that with regard to the first theory, it has long been recognized that a government official acting under color of law who intentionally

9

refuses to perform an act, even a discretionary one, based on the color of an individual's skin

violates an individual's rights to equal protection.  See Jafree v. Barber, 689 F.2d 640, 643 (7th

Cir. 1982); National Assn. for Advancement of Colored People v. Levi, 418 F. Supp. 1109, 1117

(D.D.C. 1976).   The court explained the second theory of plaintiff's surviving § 1983 claim as

follows:

> Although inartfully drafted, plaintiff's complaint sets forth allegations
> which may ultimately lead to a set of facts that could support a claim for relief
> under the state-created danger theory. Plaintiff contends the episode of street
> fighting that occurred in front of Officer Davis lasted for several minutes.  During
> this time Officer Davis purportedly did nothing, notwithstanding the fact that
> several police patrol units were in the vicinity and could have provided Officer
> Davis with assistance.  It is further alleged that Officer Davis became subjectively
> aware that Williams was searching for a gun and intentionally and willfully stood
> by because the situation involved two young African-American males.  Complaint
> at ¶ 36. ...
>
> Specifically, plaintiff may be able to prove that Officer Davis' refusal to
> intervene on plaintiff's behalf led to a foreseeable increase in the risk of harm
> plaintiff faced at the hands of Williams. ...  Plaintiff is seeking to prove there was
> a pre-existing understanding among at least some officers to permit  violence
> between young African-American males to continue unabated as a means of
> expressing the officers' disdain for the mandate of the consent decree, and this
> pre-arranged understanding motivated Officer Davis' decision not to provide the
> protective services that otherwise would have been made available under the
> circumstances.
>
> Plaintiff also may ultimately  be able to offer proof of a set of facts that
> would support a determination that Williams became aware of Officer Davis'
> unwillingness to intervene on plaintiff's behalf, and his failure to intervene
> emboldened Williams to resort to violence that he would not have otherwise
> perpetrated.

Opinion of September 5, 2003 (Doc. No. 24) at 9-10 (citations omitted).[6]

---

[6]The court referenced Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir 1993), in support of
this theory of liability. In Dwares, the Second Circuit recognized that police officers' prearranged
understanding to sanction private violence coupled with the affirmative action of withholding
protective services which otherwise would have been available survived the defendants'
challenge under DeShaney.  There, the plaintiff attended a public demonstration that involved the
burning of an American flag.  The plaintiff was beaten by a group of "skinheads" in retaliation
for supporting the demonstration.  Based on news reports, the plaintiff alleged that the police had
an implicit understanding sanctioning the assaultive conduct of the skinheads and that no action
would be taken against them "unless they got completely out of control."  Dwares, 985 F.2d at

Plaintiff also was permitted to pursue a § 1983 policy and practice claim against the City. The court explained:

> Plaintiff has placed the City on notice that the failure to train Pittsburgh Police Officers in cultural diversity was a moving force in producing plaintiff's injuries. Plaintiff contends the City police had a long-standing policy and custom of being intolerant of the rights of African-Americans. This policy in conjunction with the City's failure to train its police officers properly in the use of force ultimately resulted in the litigation leading to the consent decree; the decree mandated (among other things) the implementation of diversity training for police officers. The officers' disdain for the City's decision to enter into the decree coupled with the City's superficial implementation of the cultural diversity training required by the decree purportedly led to the retaliatory practice of using "no force" when dealing with street violence involving young African-American males, which practice was employed to plaintiff's detriment and became the proximate cause of plaintiff's injuries. Although the factual grounds to support these allegations are sparse and less than clear, plaintiff adequately has satisfied the pleading standards governing a § 1983 <u>Monell</u> claim. Accordingly, the City's request for dismissal of plaintiff's § 1983 claim must be denied.

Opinion of September 5, 2003, at 14. The parties conducted discovery based on these remaining theories of § 1983 liability.

Defendants seek summary judgment on a variety of grounds, contending in essence that plaintiff has advanced nothing more than a claim for failure to provide police protection against the violent conduct of a private citizen, which is barred by <u>Deshaney</u> and the Third Circuit's precedents in accordance therewith. Specifically, defendants contend that plaintiff has failed to establish (1) a special relationship or state created danger, (2) that he was treated differently because of his race, (3) that the City was deliberately indifferent to an unconstitutional policy or practice that caused plaintiff's injuries, and (4) competent evidence to support his theory that a clandestine plan existed among certain of Pittsburgh's rank and file police officers as a way to voice their disdain for the consent decree, let alone that Officer Davis acted pursuant to or in furtherance of any such plan. Plaintiff argues that material issues of fact remain for trial.

---

97. The court concluded that the intentional decision to refrain from providing protective services under such circumstances went well beyond the allegations in <u>DeShaney</u>, and it was a matter of simple logic "to infer that such prior assurances would have increased the likelihood that the "skinheads" would assault demonstrators." <u>Id.</u>

The record demonstrates that defendants are entitled to summary judgment for several reasons. First, each of the remaining theories of plaintiff's § 1983 claim is dependent upon two basic factual predicates: (1) that an implicit agreement existed among certain of Pittsburgh's rank and file police officers to use "no force" whenever they were confronted with altercations between African American males as a way of expressing their disdain for the City's decision to enter into the consent decree; and (2) that Officer Davis acted pursuant to or in furtherance of the implicit agreement when he witnessed the altercation between plaintiff and Ricky Williams. Plaintiff has failed to proffer competent evidence to support a finding in his favor on either of these factual predicates. In addition, plaintiff has failed to proffer competent evidence that Officer Davis' actions at the scene failed to comply with or were otherwise inconsistent with proper and established protocol. Third, plaintiff's attempt to create a new theory of liability based on the actions of Officer Klein is unavailing. The reports to the 911 dispatch operator fail to overcome DeShaney. Finally, plaintiff's attempt to advance a policy and practice claim against the City based on an asserted failure to implement effectively the requirements of the consent decree fails to overcome the findings and orders of this court in United States v. City of Pittsburgh, Civil Action No. 97-354 (W.D. Pa. 1996).

Plaintiff's attempt to establish an implicit clandestine agreement by certain rank and file police officers within the Pittsburgh Police Department is based upon statements made by local politicians as reported in various newspaper articles spanning approximately five years. These statements were made by a variety of politicians and public officials with regard to matters bearing on or related to the initiation of the litigation against the City by the United States Department of Justice and/or the particular author's perspective on the practical repercussions from the requirements of the consent decree entered into by the Untied States and the City.

Specifically, plaintiff notes a series of articles highlighting the controversy among high-ranking public officers concerning the public performance provided by the Pittsburgh Police and the ramifications from the City's decision to enter into the consent decree. Plaintiff references a

12

February 16, 1998, newspaper article in the Pittsburgh Post-Gazette reporting on and contrasting the purported views of Pittsburgh Fraternal Order of Police President Marshall W. Hynes and Chief of Police Robert W. McNeilly, Jr., each of whom offered a different theory as to why crime rose 9.5 percent in the City in 1997. Hynes attributed the increase to officers not going the extra mile and investigating situations in the "gray area," suggesting that the consent decree rewards complacency. McNeilly, on the other hand, noted that crimes were not rising across the boards and that recent awards had been given to officers leaving their stations and effectuating arrests and citations. As a follow-up, plaintiff notes an article from February 25, 1998, wherein Hynes purportedly commented that McNeilly's decision not to fight the City's decision to enter the consent decree had alienated all different factions of the police force. In contrast, the Mayor of the City was purported to have the "utmost confidence" in McNeilly's leadership. These articles appeared approximately one year after the consent decree was approved by this court.

Plaintiff's evidence of disdain for the consent decree is based on an editorial by a past vice president of the Pittsburgh Fraternal Order of Police characterizing the consent decree as a device to interfere with the enforcement of laws "when the apostate Clinton-Gore administration needed a city to serve as a 'judas goat' for intervention into urban policing." The officer goes on to express his dissatisfaction with the monetary costs of implementing the consent decree in relation to what the officer perceives as minimal gain and the lack of any investigation into malfeasance at the managerial level of local politics. In addition, plaintiff cites a July 1, 2003, Post-Gazette article by the same officer voicing his views on whether city police should be forced to reside within city limits. Finally, plaintiff submits articles from the Post-Gazette on December 30, 1998, and February 12, 1999, reporting on the controversy surrounding the December 21, 1998, shooting by Patrolman Jeffrey Cooperstein of motorist Darren S. Grimmitt, Sr. after a car chase downtown.

Plaintiff also cites an August 2, 2002, article in the Pittsburgh-Post Gazette reporting on the results of an audit of operations at the City's Office of Municipal Investigations ("OMI")

13

conducted by court-appointed auditor James D. Ginger of Texas. The article was critical of OMI with regard to its backlog of cases, the techniques used to investigate complaints, the improper clearing of some officers, and the failure to train staff members properly. The local executive director of the American Civil Liberties Union expressed concern as well about going "back to the dark ages of accountable police officers being aloud to ravage people's rights."

Finally, plaintiff references testimony from the officers who investigated the burglary of plaintiff's residence, Officer Klein and Officer Milie. Each officer testified to her "understanding of the decree in terms of fairness or unfairness to the police department." Officer Klein expressed reservations about understanding the question as phrased by plaintiff's counsel, but explained that in general the consent decree helped improve the department by catching up on civilian complaints, clearing cases, and requiring better report writing. She also noted that traffic reports and the like were greatly influenced by the racial composition of the neighborhoods in question when it came to monitoring traffic stops on patrol. Deposition of Officer Klein, Exhibit O of Plaintiff's Counter Statement at 13-14. Officer Milie noted that implementation of the consent decree meant her official actions were more closely monitored and she was required to complete additional paperwork. Deposition of Officer Milie, Exhibit I at 20-21. She also observed that the racial composition of the neighborhood had a direct correlation to the race of individuals most frequently stopped on routine patrol within that neighborhood. Id.

Plaintiff proffers no other evidence to support a finding that an implicit agreement existed among various City police officers to withhold or refuse to provide police protection services to African American males engaged in disruptive or violent conduct as a way of expressing their disdain for the City and Chief of Police's decision to enter into the consent decree. The sole basis for plaintiff's contention that officer Davis acted pursuant to such a clandestine plan consists of Officer Davis' actions at the scene on May 24, 2002, when plaintiff was shot by Williams.

Procedurally, it is axiomatic that a plaintiff must proffer competent evidence to support

14

each factual finding essential to the theory of liability advanced. See Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 94 (3d Cir. 1999) (it is incumbent upon the non-moving party to offer sufficient admissible evidence to support its burden of proof); Foulk v. Donjon Marine Co., Inc., 144 F.3d 252, 255 n.5 (3d Cir. 1998) ("the standard for summary judgment is well-settled: summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."); Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (when opposing summary judgment, a "plaintiff ... must point to admissible evidence that would be sufficient to show all elements of a prima facia case under applicable substantive law"); Robertson v. Allied Signal Inc., 914 F.2d 360, 365 (3d Cir. 1990) (to withstand summary judgment, the non-moving party must present some competent evidence that will support the factual findings necessary to impose liability). In this regard hearsay statements can be considered on a motion for summary judgment only if they are admissible at trial or capable of being reduced to a form of admissible evidence. Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (citing Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) and J.F. Fesser, Inc. v. Serv-a-portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990)).

Substantively, to succeed on a § 1983 claim against the City based on a discriminatory denial of police protection on the basis of race, a plaintiff must established two elements: (1) that the inaction on behalf of the officer in question was substantially motivated by a policy or practice that was based at least in part on racial animus; and (2) a causal relationship has been established between that discriminatory policy and the injury suffered by the plaintiff. Mody v. City of Hoboken, 959 F.2d 461, 466 (3d Cir. 1992); Britton v. City of Erie, 933 F. Supp. 1261, 1267 (W.D. Pa. 1995) ( to succeed on a § 1983 claim based upon the equal protection clause, a plaintiff "must demonstrate 'proof of racially discriminatory intent or purpose'") (citing Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977)). In this context proof that an action was motivated by race implies more than volition or intent in

15

the sense of awareness of consequences.  Id.  (quoting Personal Administrator of Massachusetts v. Feeney, 442 U.S. 256, 259 (1979)).  Instead, "it implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of' its adverse affects upon an identifiable group."  Id.  A mere showing that the decision had a disproportionate effect on African Americans is not sufficient.  Id.  (citing, Arlington Heights, 429 U.S. at 264-65).

A plaintiff must prove four elements to sustain liability under a state-created danger claim: (1) the  ultimate harm caused was fairly foreseeable and direct; (2) the state actor acted with willful disregard for the safety of the plaintiff; (3) there was some contact between the parties sufficient to make plaintiff a foreseeable victim of the defendant's tortuous acts; and (4) the state actors used their authority to create an opportunity for the harm to occur that would otherwise not have existed.  Kneipp, 95 F.3d at 205; Estate of Smith v. Marasco, et al., – F. Supp. 2d – (E.D. Pa. 2002).  In addition, the Supreme Court has held that a plaintiff seeking to establish a Fourteenth Amendment due process claim must demonstrate that the offending conduct  "shocks the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).[7]

Even assuming for the purposes of argument that plaintiff can overcome the hearsay impediment to the evidence he advances to support his allegation of a "pre-existing understanding among the officers to permit violence between African-Americans males to continue unabated as a means of expressing the officers' disdain for the mandate of a federal consent decree," the politically charged statements of the declarants referred by plaintiff fail to provide competent evidence of such an agreement.  The statements of the president and the vice president of the Pittsburgh Fraternal Order of Police indicating the consent decree would or did

---

[7]The Court specifically emphasized that the fault required to maintain a § 1983 due process claim is dependent upon the circumstances of the particular case and suggested that while the "shocks the conscience" standard is applicable, deliberately indifferent conduct may well meet this standard under appropriate circumstances.  See Lewis, 523 U.S. at 849-50; Cannon v. City of Philadelphia, 86 F.Supp. 2d 460, 467 (E. D. Pa. 2000).

have the effect of discouraging officers from taking "that extra step" and reducing "proactive policing" fall far short of affirmative proof of such an agreement. And the statements made by the local director of the ACLU indicating police officers are "declining to do their jobs" as well as the politically charged statements of Councilman Sala Udin that there were police officers who "obviously wait in ambush, who murder African American men and who are part of a 'right wing organization' that has formed within the city police department" are nothing more than the declarant's subjective views concerning a matter of public interest. There is no evidence that such statements are based upon personal knowledge, a prerequisite to establishing competent evidence. See Fed. R. Evid. 602. Nor is there any basis to assume that such statements were the result of detailed and disciplined studies. Consequently, these statements fail to provide competent proof of anything, let alone the pre-existing understanding plaintiff must prove to proceed on his racially motivated withholding of police protection claim.

Furthermore, plaintiff has not come forward with one scintilla of evidence that Officer Davis was motivated by or acted with such intent in responding to the May 24, 2002, incident between Williams and plaintiff. Merely asserting and proving that Officer Davis could have acted more promptly or more forcefully falls short of competent evidence that he acted with the requisite discriminatory intent. See Moua v. City of Chico, 324 F. Supp.2D 1132, 1140 (E.D. Ca. 2004) ("plaintiffs' showing that one officer or even the police department as a whole acted slowly in response to [the perpetrator's] repeated attacks does not of itself show discriminatory intent.").

Moreover, there is no circumstantial evidence from which an inference can be drawn that Officer Davis was motivated to express disdain toward the requirements of the consent decree. Officer Davis became a City of Pittsburgh Police Officer on October 4, 2000, and was sworn in during the Spring of 2001. He attended state-mandated training at the Beaver County Police Academy and took the same courses again at the Pittsburgh Police Training Academy after accepting a conditional offer of employment. His training at the Academy included cultural

17

diversity, use of force, integrity in ethics, and verbal de-escalation or verbal judo. In addition, Officer Davis has had to undergo "in service training once a year" which includes updates in various subjects. By the time Officer Davis first became a city police officer implementation of the consent decree had been underway for approximately three years. There is no evidence that he associated with any particular group of officers that openly expressed opposition to the decree or actively resisted its implementation. Thus, the circumstances surrounding the employment of Officer Davis as a City of Pittsburgh Police Officer can only be said to further undermine any attempt to establish that he acted with discriminatory motive or intent.

In addition to the lack of any competent evidence to establish discriminatory intent or motive, the record also lacks competent evidence to establish that Officer Davis deviated from or failed to follow proper and acceptable protocol. Chief McNeilly specifically testified that Officer Davis followed appropriate police procedure and protocol in handling the situation. He opined:

> You can sit and try to second guess, Monday morning quarterback, anybody you want to in life. But the officer handled it the right way [the way] their trained to do, what officers are expected to do. You call radio and get back-up.

> What they teach you to do is, get help first, as soon as you can get it. Because you know that, one officer trying to break up two combatants is not going to be successful. It just doesn't work. You need help there. He could see he needed help and he called for it. He did the smart thing. He did the right thing.

McNeilly Deposition at 114, 119. Commander Valenta, who conducted the investigation for OMI and reviewed all material available, reached the same conclusion. Valenta Deposition at 56-57. The matters were then referred to an independent auditor, Dr. James Ginger, who is considered an expert on conducting review of internal affair complaints, who agreed with OMI's finding. Id. at 57.

Plaintiff offers no competent evidence to establish that Officer Davis did not follow appropriate and acceptable police protocol in waiting for back-up to arrive prior to attempting to intervene. Under these circumstances plaintiff has failed to proffer sufficient evidence to satisfy the second element of the state created danger theory established in Kneipp. See Handsbury v.

18

City of Philadelphia, 232 F. Supp. n.2d 404, 410-11 (E.D. Pa. 2002) ("in light of this testimony and the absence of any evidence of police action 'that is so ill-conceived or malicious that it shocks the conscience,' Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000)], I cannot find that plaintiffs offered sufficient evidence to satisfy the second prong of Kneipp."). And the plaintiff's contention that Officer Davis simply should have apprehended Williams at plaintiff's request or used his siren, flashed his lights, used a nightstick or other weaponry, or used his microphone fails to provide competent evidence from which the finder of fact can conclude that Officer Davis grossly deviated from acceptable or expected police protocol. Consequently, the record lacks an evidentiary basis from which the finder of fact can conclude that Officer Davis' actions were motivated by something other than a desire to perform his job in a safe and appropriate manner.

Moreover, the lack of any competent evidence to establish that Officer Davis should have engaged in a course of action other than that which he undertook also defeats plaintiff's attempt to demonstrate that his injuries were caused by a deprivation of his constitutional rights. Thus, even assuming for the purpose of argument that plaintiff has a federal constitutional right to rescue or protection services under limited circumstances, to permit the finder of fact to conclude that plaintiff's injuries were incurred as a result of Officer Davis' actions at the scene without sufficient competent evidence establishing a deviation in proper police intervention would be tantamount to a finding of causation based on pure speculation and conjecture. The failure to proffer competent evidence to establish a causal relationship between the asserted discriminatory conduct or policy and the resulting injury is fatal to plaintiff's § 1983 claims. Mody, 959 F.2d at 466; Fulson v. City of Columbus, 801 F. Supp. 1, 6-7 (S.D. Ohio 1992).

Plaintiff's efforts to establish liability against the City equally suffer from fatal evidentiary shortcomings. As previously noted, "municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury.'" Bielevicz, 915 at 849-50 (quoting Monell, 436 U.S. at 694). Proving a government policy or custom can be

accomplished in a number of different ways. Id. "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law. Id. (citing Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 42 U.S. 919 (1989)).

First and foremost, plaintiff's failure to proffer competent evidence to support a finding that Officer Davis deprived plaintiff of a constitutional right forecloses plaintiff's ability to establish municipal liability against the City. See Brown, 318 F.3d at 482 (although a municipality can be found liable under § 1983 even when no individual officer violated plaintiff's constitutional rights, "there still must be a violation of the plaintiff's constitutional rights."); Searles v. South Eastern Pennsylvania Transportation Authority, 990 F.2d 789, 794 (3d Cir. 1993) ("thus, we need not reach the issue of whether SEPTA could be held liable where, as here, we have concluded that no constitutional right was violated."). But even assuming for purposes of argument that the analysis set forth above is flawed, plaintiff's attempt to burden the City with § 1983 liability fails for additional reasons as well.

Plaintiff's effort to establish that the City has failed to train officers properly in cultural diversity in accordance with the consent decree is misplaced for several reasons. Initially, plaintiff has failed to identify any personal constitutional right upon which he can insist that the City's police force must be adequately trained in cultural diversity. The fact that the consent decree provided for such training as a remedy for those who alleged a violation of their Fourth Amendment rights does not give plaintiff standing to insist on such training as a matter of constitutional right. See Mody, 959 F.2d at 467 (demonstrating that police engaged in poor

20

police practices or were negligent in failing to follow proper police protocol without sufficient evidence to permit a finding that such practices or lack of training was racially motivated precludes § 1983 municipal liability).

Second, in addition to the lack of competent evidence to establish an implicit clandestine plan to withhold police protection from minorities as a means of expressing disdain for the consent decree, plaintiff has failed to proffer any competent evidence to support a finding that any such plan was adopted or implicitly ratified by the City or that any such course of conduct became so well-settled and permanent as virtually to constitute law. No decision-maker possessing final authority to establish municipal policy ever issued an official proclamation, policy or edict endorsing such a plan, and the politically charged statements in the various newspaper articles that officers would not engage in "pro-active policing" or "take that extra step" do not provide evidence of a given course of conduct that is so well-settled that it virtually constitutes law. Without evidence establishing proof of knowledge and acquiescence by appropriate city officials, plaintiff's attempt to establish a policy or custom attributable to the City upon which to assign liability for his injuries fails as a matter of law.

Third, plaintiff's contention that the City has failed to implement the decree aggressively and this failure caused Office Davis not to know the degree of force that should have been used when confronted with the street fight between plaintiff and Williams lacks competent evidence on two levels. As an initial matter, there is no evidence to support a finding that Officer Klein and Milie's testimony about how the consent decree has changed their jobs as a practical matter reflects a custom or policy that was deliberately indifferent to a constitutional right advanced by plaintiff. In addition, plaintiff's contention that more aggressive implementation of the decree would have resulted in Officer Davis performing his job differently is sheer speculation and conjecture. Thus, the record does not contain any competent evidence to establish that plaintiff's injuries were caused by the manner in which city officials have implemented the requirements of the consent decree. And of course, the records of this court demonstrate that the City has

implemented the requirements of the consent decree in an adequate and satisfactory manner. See Joint Motion by United States, City of Pittsburgh, Pittsburgh Bureau of Police and Pittsburgh Department of Public Safety to Terminate Consent Decree and Dismiss the Case, Doc. No. 74 in USA v. City of Pittsburgh, et al., Civil Action No. 97-354, and Order of April 7, 2005, granting that motion and terminating the consent decree.

Fourth, plaintiff has failed to provide any credible evidence that the procedures used in high crime areas are motivated by or based on race or have any disparate impact on the constitutional rights of African Americans. Nor has he shown that the police procedures utilized in such areas are known to subject citizens within those communities to an increased likelihood of having their constitutional rights violated. Thus, even beyond plaintiff's lack of competent evidence to challenge customary police protocol used in high crime areas, plaintiff has failed to establish the existence of a custom or policy that City officials knew or should have known would transgress the established constitutional rights of the citizens within those areas. See Canton v. Harris, 489 U.S. 378, 388 (1989) ( In defining the limited scope of municipal liability under §1983, the Court opined that "the inadequacy of police training may serve as a basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact."); Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999) ( utilizing  the following three-part test in determining whether a municipality's failure to train or supervise amounted to deliberate indifference: (1) the plaintiff must show that municipal policymakers know that employees will repeatedly confront the situation in question; (2) the situation must involve a difficult choice or history of employee mishandling; and (3) the wrong choice by an employee  will often result in the deprivation of a citizen's constitutional rights) (following but not exclusively adopting the approach utilized in Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992)).        Finally, plaintiff's railings against the City for its alleged (1) continuing use of OMI procedures, (2) lack of annual training in use of force and cultural diversity, and (3) mere token compliance with the consent

22

decree fail to identify policies, customs or practices which plaintiff has standing to challenge. There is no competent evidence to support a finding that any of these asserted policies, customs or practices had a causal role in bringing about plaintiff's injuries. See Hedges v. Musco, 204 F.3d 109 (3d Cir. 2000) (It is axiomatic that "[a] § 1983 action, like its state tort analogs, employs the principle of proximate causation.") (quoting Townes v. City of New York, 176 F.3d 138, 146 (2d Cir.1999)(citations omitted)); see also Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir.1996) (in a § 1983 suit, "[a] plaintiff must ... establish that the government policy or custom was the proximate cause of the injuries sustained"); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) ("once a §1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.").

Finally, plaintiff's attempt to predicate § 1983 liability on Officer Klein, Officer Boose and their supervisor's failure to take more prompt and additional action in investigating the burglarization of plaintiff's home on May 21, 2002, is based on nothing more than the negligent failure to provide effective investigative and/or protective services. The linchpin of plaintiff's theory is that Officer Klein and the officers associated with the burglary investigation failed to confront Williams and arrest him promptly after plaintiff identified him to Officer Klein as the perpetrator of the burglary in the early morning hours on May 22, 2002. Of course, without evidence of discriminatory intent, a simple failure of diligence, perception, or persistence in the investigation or prosecution of an individual who perpetrates violence on a minority victim does not implicate a constitutional right. Moua, 324 F. Supp.2d at 1140 (collecting cases in support); Mody, 959 F.2d at 465-67. Such claims are based on the negligent failure to provide protective services and § 1983 claims predicated on the same are barred by DeShaney. See Nicina, 212 F.3d at 806; ("a state's failure to protect an individual against private violence does not constitute a violation of due process"); Brown, 318 F.3d at 476 ("there is no federal constitutional right to rescue services, competent or otherwise."); Mark v. Borough of Hatboro, 51 F.3d 1137, 1149 (3d

Cir. 1995) (a state actor's failure to protect a citizen against the violent acts of the third party does not contravene the Due Process Clause). And plaintiff's contention that he was exposed to increased danger by the various officials' requests to be present when the detectives arrived fails as a matter of law because plaintiff was neither restrained from freedom of choice, as his leaving to stay at his mother's house on May 23, 2003, clearly demonstrates, nor exposed to any foreseeable risk of harm that did not already exist.

In short, the Due Process Clause stands as a limitation on the state's power to act. It does not provide a guarantee of certain minimal levels of safety or security from the services provided by public officers. It does not place an affirmative obligation on police officers to ensure that citizens are not harmed by means other than the process of law. Because all of plaintiff's claims against the individual officers are barred by these well established principles and plaintiff has failed to provide competent evidence to establish the elements for Monell liability against the City, defendants' motion for summary judgment must be granted. An appropriate order will follow.


DS Cercone
David Stewart Cercone
United States District Judge

Date: July 29 2005


cc:     Mark J. Bushnell, Esquire
        Bushnell Law Firm
        436 Seventh Avenue
        2202 Koppers Building
        Pittsburgh, PA 15219

        Jacqueline R. Morrow
        City of Pittsburgh Department of Law
        414 Grant Street
        313 City-County Building
        Pittsburgh, PA 15219

A. Bryan Campbell, Esquire
220 Grant Street
6th Floor
Pittsburgh, PA 15219